PEARL BRIGGS, Respondent, v. FRANK COYKENDALL and Ella COYKENDALL, and Frank Coykendall, Appellant.

(224 N. W. 202.)

Filed January 8, 1929. Rehearing denied April 5, 1929.

*J. C. Adamson,* for appellant.
*W. M. Anderson* and *F. T. Cuthbert,* for respondent.

BURR, J. This is an action to recover $10,000 damages for alleged slander of title to 80 acres of land situated in Ramsey county, this state.

The land in issue was owned formerly by one Harry Coykendall

and the plaintiff alleges in her complaint that in November 1925 she purchased this land from him, went into possession of it, leased it to tenants and on December 30, 1926 received a warranty deed from the former owner. The complaint further states that the defendants, knowing that she had purchased the land and was in possession and knowing that she had this warranty deed, although not of record, and with "the purpose in mind of libeling and slandering her title thereto and beclouding it so that she could not sell, mortgage or dispose of the same and for the purpose of injuring her in her title, possession and ownership thereof, and the crops grown thereon—fraudulently and maliciously and with the intent stated obtained a deed to said land from the said Harry L. Coykendall at the same time knowing that he had given a deed thereto to the plaintiff who was in possession thereunder; that said Harry L. Coykendall had nothing to deed, for the sum of $50 and that with like intent and purpose and also to libel and slander her title thereto caused the said deed to said land to be recorded in the office of the register of deeds of said Ramsey county, N. D. it being in the form of a warranty deed dated July 5, 1927 from Frank L. Coykendall (Harry L. Coykendall) to the defendant Ella Coykendall purporting to convey the land in question, and which deed was recorded—July 7, 1927 thereby falsely and maliciously published that the said Ella Coykendall was the owner of said land."

The complaint then alleges that by reason of the foregoing acts her title is clouded, she is deprived of the power of disposing of her title, her title is made unmarketable, she cannot enjoy title to the land "until the determination of an action to clear same in the courts;" that she had made demand on the defendants for a deed but they refused to remove the cloud and claim they are the owners, and entitled to the crops. She alleges the land is worth $3,200, with $1,400 encumbrance against it, that it will cost her $200 to commence an action to remove the cloud, that she expended $75 in making trips in an attempt to settle the difficulties; that "because of the annoyance and trouble she had been put to by reason of the acts of the defendant as heretofore alleged she has suffered mentally in the sum of $3,000, that because of the malice, fraud and oppression practiced upon her by the defendants she asks exemplary damages in the sum of $5,000."

The defendants demurred to the complaint on the ground that it

did not state facts sufficient to constitute a cause of action, and on the demurrer being overruled answered separately. In these answers defendants deny knowledge of plaintiff's claim and allege title in the defendant Ella Coykendall, through deed from Harry Coykendall. Appellant denies asserting in himself any title or claim to the property and alleges that anything he did was done as agent or attorney for the co-defendant, his sister.

The case therefore resolves itself into a contest over the title to the land, for the issue of title is raised squarely and the case was tried on the theory that plaintiff must prove she, and not the defendant Ella Coykendall, is the owner of the land. The plaintiff recognizes this and on this theory the court instructed the jury.

The case was submitted to a jury who returned a verdict for the plaintiff and assessed her damages in the sum of $440 against Frank Coykendall only. Judgment was thereupon entered in favor of the plaintiff and against Frank Coykendall for $440 and costs, and for dismissal of the action as to Ella Coykendall.

The appellant moved for a new trial, basing his motion upon three general grounds: First, that the court erred in refusing to grant the motion of the appellant for dismissal of the action, made at the close of plaintiff's case; second, that the evidence was insufficient to sustain the verdict; and third, the court erred in its charge to the jury. The court denied this motion and the defendant Frank Coykendall appeals.

The motion to dismiss was not renewed at the close of the case, nor was a motion made for judgment notwithstanding the verdict. Hence we do not consider this ground. See Carson State Bank v. Grant Grain Co. 50 N. D. 558, 197 N. W. 146.

This action is based on the theory of defamation of plaintiff's title to real property and the resulting damages. Plaintiff had no record title, when deed to Ella Coykendall was given and recorded and the only acts charged which can be said to defame title are the placing on record of a deed to Ella Coykendall and a notice to the elevators that the landlord's share of the crop belonged to her. This notice necessarily implied that the plaintiff was not the owner of such crop.

The defendants are brother and sister, and are uncle and aunt of the plaintiff, and are so designated in this opinion. The plaintiff is the

sister of Harry Coykendall. The evidence shows that Harry sold the land in question to his sister and on December 30, 1926 gave her a deed to the land, which deed was not filed for record until July 15, 1927. Ten days before she filed her deed Harry deeded the land to his aunt and this deed was filed for record July 7, 1927.

Slander of title is a false and malicious statement, oral or written, made in disparagement of a person's title to real or personal property, and causing him special damage. See Burkett v. Griffith, 90 Cal. 536, 13 L.R.A. 707, 25 Am. St. Rep. 151, 27 Pac. 528. It is a figure of speech applicable to title, where special damage results. Kendall v. Stone, 5 N. Y. 14, 15.

In determining this appeal we take the testimony offered by the plaintiff in its most favorable aspect toward her case, even though much of it is controverted by the appellant. Such testimony shows that in November 1925 the plaintiff was negotiating with her brother for the purchase of his land, and these negotiations were carried on in the home of her aunt. The plaintiff agreed to buy the land for $2,-500, had a mortgage for $1,000 placed thereon, gave the major portion of the proceeds to her brother, agreed to deliver to him a share of the crops until the purchase price was paid, and assumed some of his debts. The plaintiff expressly states that these negotiations were not carried on in the presence of her uncle. She claims her uncle knew she was trying to buy the land, but she admits she never told him she had bought it. She states that the reason she did not put her deed on record is she did not have the money to pay the taxes, and when her uncle paid the taxes and put the aunt's deed on record then she put her deed on record.

In the early part of 1927 one Brending, who held a mortgage against the land, told the appellant that the plaintiff owned the land. He testified at first, that in September 1927 he had a talk with the defendant and at that time told him the plaintiff had a deed to the land. This would be two months after Harry deeded the land to his aunt, and therefore showed no knowledge on the part of the appellant at the time he got the deed for his sister. However, the same witness says, later on, that it was in the first part of 1927 he had this conversation. He admitted his recollection was somewhat hazy and the only thing he was certain about was the conversation, that he could not tell

the exact time, although he was fairly certain it was in the forepart of 1927.

Brending testified that he and the appellant had some conversation regarding the land and that the holder of the first mortgage was going to foreclose. Brending, at that time, held the second mortgage—afterwards he held three mortgages—and they were talking it over because the appellant held the third mortgage and they were wondering who had title to the land. The appellant wanted Brending to take up the third mortgage and during this conversation the witness told appellant the plaintiff had the title to the land.

The appellant admits that some time in the fall of 1926 he was talking with plaintiff's tenant who was farming the land, that he had gone to see him because he was his tenant also. At that time the tenant showed him a lease made by the plaintiff wherein the plaintiff described herself as owner of 700 acres of land, including the 80 acres in question. The tenant testified to the same effect. But the record shows this lease, Ex. 1, contains land most of which the plaintiff did not own and never had owned, and appellant knew she did not own. But for the purpose of this appeal we assume that plaintiff had a deed to the land in question and that the appellant knew it.

However, it is not enough for her to show she had this deed and that appellant knew it. Plaintiff must also show that any assertion of title in some one else, made by the appellant, was made maliciously. Conceding that the aunt's claim of title to the land is without foundation, and therefore that she was not the owner of the crops, yet this in itself is not sufficient basis for an action for slander of title. Not only must the statements and acts have been false but they must have been made maliciously, for there can be no slander of title without malice. See Harrison v. Howe, 109 Mich. 476, 67 N. W. 527. There is no claim that the appellant at any time made any statements to any one regarding the title of plaintiff to the land, or orally disparaged her title. If the plaintiff can recover at all it must be because that the appellant placed on record a deed to this property showing title in some one other than the plaintiff, and thereafter demanded the crops and thus interfered with her rights. It has been held that the filing of record of a false claim of right to land or to have land conveyed is actionable where there are resulting damages such as preventing a sale

or costs to clear title (Collins v. Whitehead (C. C.) 34 Fed. 121), but it is not sufficient that the claim of property be false. Malice is an essential ingredient—the statements must have been made maliciously. See Graham v. Reno, 5 Colo. App. 330, 38 Pac. 835; Duncan v. Griswold, 92 Ky. 546, 18 S. W. 354; Feiten v. Milwaukee, 47 Wis. 494, 2 N. W. 1148. In Cardon v. McConnell, 120 N. C. 461, 27 S. E. 109, it is held not only must the plaintiff show the defendant published this false claim of title, but also that he did it maliciously, and in Coffman v. Henderson, 9 Ala. App. 553, 63 So. 808, it is held that the claim of defendant must be both false and malicious.

The basic principle of such an action therefore is malice. There can be no malice in the legal sense when the parties have color of title and have a bona fide belief therein. See Coffman v. Henderson, supra.

The words "malice" and "maliciously" when so employed import a wish to vex, annoy, or injure another person or an intent to do a wrongful act. "Malice may consist in a direct intention to injure another, or in a reckless disregard of his rights, and the consequences that may result to him." Gott v. Pulsifer, 122 Mass. 235, 23 Am. Rep. 322. This may be shown by direct proof or it may be presumed from acts; but these acts must show the intention. The entire record is silent as to malice. While malice may be presumed from acts, yet the acts must be such as to suggest malice.

It is not ever fairly inferable, that the appellant, in advising his sister to take a deed and getting it for her, or even in using his sister as a convenience for himself as plaintiff charges, intended to vex or annoy the plaintiff, or injure her in any way, or do a wrongful act. Respondent urges the testimony shows it was appellant who furnished the money for the deal—not the aunt—but the undisputed testimony shows that sometime previous the defendant Ella Coykendall had deeded all her land to the appellant under an agreement whereby he was to pay her $600 a year during her lifetime, and that she directed him to take $50 of this money and send to Harry for the deed. Other than the fact the appellant looked after the transaction for his sister there is no testimony whatever connecting the appellant with the matter. Whatever was done was done for the aunt, and appellant directed the matter and then asserted title in the aunt. Assertion of a claim of title to the property does not in itself warrant a presumption of

malice, even if the claim be unfounded (Coffman v. Henderson, supra), and mere loss or expense to the plaintiff is not sufficient, otherwise every time one asserted a claim of title to property, and was unable to substantiate it, one would subject himself to a suit for slander of title. This applies to an agent of attorney as well as to the principal and therefore is applicable to the appellant no matter in what capacity he acted. So long as a claim is asserted in good faith, there can be no action and plaintiff must prove lack of good faith, for malice must be proved as a substantive fact. See Hopkins v. Drowne, 21 R. I. 20, 41 Atl. 568. Respondent urges that the jury found lack of good faith because of the acts of the appellant; but no jury has the right to find bad faith without facts and circumstances indicating it. Malice is a state of mind, and before a jury may infer malice there must be more than probability of loss, there must be more than a possibility that defendant had a bad motive, there must be something from which such bad motive can be fairly inferred, there must be an intent to vex or annoy the plaintiff, or injure her unless, of course, the acts are such that malice must be presumed. True, this may at times be shown by unfounded claims, with attendant circumstances; but there must be a showing that the unfounded claims were made with intent to hurt plaintiff.

Malice certainly cannot be inferred from the testimony introduced by defendants. Appellant, who is a lawyer, says that he never had any such conversation as the witness Brending relates, and did not know plaintiff had a deed; that he was merely acting as agent for his sister, that when he learned from Brending that Harry would sell his interest in the land for $50 he went to the records to see whether Harry had placed any more mortgages against the land; that he held the third mortgage, and, when he found there were no more mortgages and no deed from Harry to any one, he had a deed drawn and sent it for signature, together with a draft for $50. He knew the land was heavily incumbered—there were three mortgages aggregating $1,400 and interest, against the 80 acres—but he supposed Harry wanted to get what he could out of it. When the deed was sent he paid the taxes and put the deed on record. He knew the plaintiff was trying to make a deal with her brother to buy the land, but he never inquired of her whether she had bought it.

The aunt testified that Harry offered to sell the land to her one time before for $600, that she could not give him the money but when she heard that he was going to sell it for $50 she determined to buy it because it was land which had been filed on by her brother, Harry's father—it was Coykendall land and she did not want it to go out of the family—she became interested in buying the land because it belonged to the Coykendall estate, it was part of the farm of her brother; that she had heard through her codefendant that her nephew was going to sell the land because of the mortgages against it and that he would take $50 for his interest and rather than see the land go into other hands and pass out of the hands of the Coykendall family she told the appellant to get a draft for $50 and get a deed. The appellant was acting as attorney for his sister, the aunt; and might well believe she had a right to buy the land from Harry, even if he had sold it to the plaintiff, as the plaintiff's deed was not on record. He could well assume her deal had fallen through, and that if the aunt received a deed she would be entitled to the land and the crops. After the deed was recorded he demanded the crops for the aunt. There is nothing anywhere to show malice or malicious intent and without this necessary ingredient an action for slander cannot be maintained.

But plaintiff's case must fail for the want of another essential ingredient. There can be no action maintained for slander of title unless the plaintiff proves she was making a sale and the sale failed because of the acts of the appellant, or she was otherwise injured in the sale or lease or some other pecuniary loss occurred. Words spoken or written in relation to property or title are not actionable per se and so special damages must be shown, generally loss of sale or lease. Plaintiff must show "loss of sale to some particular person" (Wilson v. Dubois, 35 Minn. 471, 59 Am. Rep. 335, 29 N. W. 69) or that she was "about to sell or make an advantageous disposition of his land and another impertinently interfered and falsely and maliciously represented that his title was not good and thereby prevented a sale, or . . . getting for it as fair a price as he otherwise would have done" (Harriss v. Sneeden, 101 N. C. 273, 7 S. E. 804) for "words . . . though false and malicious are not actionable without special damages." Dooling v. Budget Pub. Co. 144 Mass. 259, 59 Am. Rep. 83, 10 N. E. 811, and an action will not lie for disparagement without proof of special

damages. Boynton v. Shaw Stocking Co. 146 Mass. 221, 15 N. E. 507. While plaintiff testifies she agreed to pay $2,500 for the land there was no proof offered as to its value though the complaint alleges it was worth $3,200. Nowhere does the plaintiff claim she was prevented from making a sale, or that she even tried to sell the land. Hence she suffered no damage in this respect. Anxiety or mental suffering is not an element of damage here. Plaintiff says she made several trips to see defendants in an effort to settle the matter, but this was in regard to the conflicting claims of title. She nowhere states she was prevented from selling any portion of the crop claimed, though it is admitted the elevators were notified by the appellant that his sister claimed a share of the crops. There is no proof that the elevators paid any attention to this notice or refused to give her the crops, or that she sued the elevators and thus was put to damage, nor is there any proof that she did not get all the crops she claimed—all of the landlord's share. Neither does she pretend that she was put to cost in clearing the title to the land.

This case shows conflicting claims of title and an action to determine adverse claims will settle the dispute. We need not consider the alleged errors in the charge as the lack of proof disposes of this case. The judgment of the lower court is reversed and the action dismissed.

BURKE, Ch. J., and NUESSLE, CHRISTIANSON and BIRDZELL, JJ., concur.