[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1299 
This is an oil and gas case. Plaintiffs/Appellants are landowners; Defendants/Appellees are oil companies. The case involves the determination of the rights and duties of the respective parties — the Plaintiffs as lessors, the Defendants as lessees — under an oil, gas, and mineral lease. Finding certain genuine issues of material fact, we affirm in part and reverse in part as to the order granting summary judgment for the Defendants.
Because of our holding remanding the cause for trial, a detailed discussion of the numerous factual and legal contentions urged by the parties would be imprudent. A brief, generalized recital of certain areas of factual dispute, relating to the respective claims and defenses asserted, however, is essential to an understanding of our holding.
Lessors do not contest the trial court's determination that the lease was preserved and maintained to the end of the ten-year primary term. Instead, they assert in their first claim that the lease expired by its own terms because there was no oil or gas production and no drilling or reworking operations taking place on the Lessors' property at the end of the primary term sufficient to propel the lease into a secondary term. More particularly, Lessors contend that the voluntary pooling agreement entered into with Lessees terminated; therefore, they say, production, drilling, or reworking operations *Page 1300 
elsewhere on the spacing unit would not be considered as taking place on the Lessors' land.
In order to fully understand Lessors' first claim, it is necessary to examine the relationship between the provisions of the lease and the voluntary pooling agreement.
The lease provides:
 "Lessee, at its option, is hereby given the right and power to pool or combine acreage covered by this lease or any portion thereof with other land, lease or leases in the immediate vicinity thereof, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said premises in compliance with any lawful spacing rules which may be prescribed for the field in which this lease is situated by any duly authorized authority, or when to do so would, in the judgment of Lessee promote the conservation of the oil and gas in and under and that may be produced from said premises."
The voluntary pooling agreement entered into between Lessors and Lessees pursuant to the above lease provision provides:
 "The pooled unit so created shall remain in force until:
". . .
 "(b) Terminated, after ninety (90) days from date hereof, by the failure to prosecute operations for drilling or reworking thereon for any period of ninety (90) consecutive days during which no production is had from a unit well and no shut-in well capable of producing as a unit well is located on the unit. . . ." (Emphasis added.)
The lease also states:
 "If at the expiration of the primary term, oil, gas or other mineral is not being produced on said land, or on acreage pooled therewith, but Lessee is then engaged in drilling or reworking operations thereon . . . the lease shall remain in force so long as operations are prosecuted with no cessation of more than sixty (60) consecutive days, and if they result in the production of oil, gas or other mineral, so long thereafter as oil, gas or other mineral is produced from said land or acreage pooled therewith."
(Emphasis added.)
It is undisputed that no drilling or reworking operations ever took place on Lessors' acreage within the spacing unit. Therefore, we must ascertain whether Lessors' interests were either compulsorily or voluntarily pooled with other interests in the spacing unit before we can resolve the ultimate issue in Lessors' first claim — whether the lease was propelled into its secondary term.
Lessors contend, alternatively, in their second claim: If the lease did not expire by its own terms at the end of the primary period, they are entitled to damages for breach of the implied lease obligations to reasonably develop the subject premises and to protect against drainage.
Lessees claim that the lease was maintained after expiration of the primary term by continuous drilling and/or reworking operations on the well resulting in production, and/or by tender of shut-in royalty payments prior to the expiration of the primary term. Lessees also assert that Lessors' failure to comply with an express notice provision in the lease by not giving proper written notice of the alleged breached obligation constitutes a waiver of any right Lessors might have had for cancellation of the lease, or recovery of damages. Lessors contend the notice provision was not breached, however. In addition, Lessees claim the payment and acceptance of delay rentals constitutes a waiver of any claim for either cancellation of the lease or for failure to develop or protect against drainage, and that such claim is nevertheless a collateral attack upon the spacing orders of the Alabama Oil and Gas Board.
Following the completion of the initial formal pleadings, both Lessors and Lessees filed motions for summary judgment, each accompanied by supporting affidavits. The evidentiary support adduced by the respective parties raises multiple factual issues. The following facts, however, are undisputed: *Page 1301 
On May 14, 1969, Lessors executed the "Producer's 88 Unless Lease" in question for a primary term of ten years. The lease covered land in the southeast quarter of Section 30 over the Big Escambia Creek Field in Escambia County, Alabama. The lease provided that annual delay rental payments would maintain the lease until May 14, 1979, if operations for drilling were not commenced on the land or acreage pooled therewith.
In 1972, the Alabama Oil and Gas Board established by order special field rules for the Big Escambia Creek Field. That order required that drilling units consist of governmental sections of approximately 640 acres and that only one well was to be located on each unit. In 1975, the Oil and Gas Board force pooled and integrated all mineral interests of all owners in Section 30, and appointed Exxon as the party in charge of drilling operations. The other lessees obtained working interests in Section 30.
The lease was maintained by payment of annual delay rentals through 1976. In July 1976, Exxon completed a producing well on Section 30, but not on Lessors' property. Production continued and royalties were paid thereon until December 1977, when the pressure of the well dropped to a level insufficient to cause the gas and condensate to flow inside the treatment facility which cleanses production from all the wells in the field.
Exxon had been and continued to engage in various preliminary activities related to obtaining compression facilities which would artificially increase the pressure in the Section 30 well, and other wells. Prior to May 14, 1978, delay rentals were paid and accepted. In February 1979, Lessees attempted to start up the well and reinstate production, but the tubing deep inside the well collapsed, blocking the well bore. In response to Exxon's request, the Oil and Gas Board authorized Exxon to conduct drilling and/or reworking operations at an exceptional location within the Section 30 drilling unit. In March 1979, Lessees tendered a shut-in royalty payment, but Lessors refused the payment and notified Lessees by letter that in their opinion the lease had expired by its own terms. In April 1979, on-site preparations for drilling operations began. The drilling rig was assembled and rigged up by May 12, 1979. Lessors sidetracked the oil well to a new bottomhole location, which resulted in production on September 1, 1979. The well has continued to produce with the aid of compression since that time.
ARCP 56 provides that summary judgment is appropriate only when the moving party has demonstrated that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Bryant v. Morley, 406 So.2d 394
(Ala. 1981). The books are replete with cases interpreting and applying the summary judgment rule. See, e.g., Ex parte BagbyElevator and Electric Co., Inc., 383 So.2d 173, 176 (Ala. 1980); Quillen v. Quillen, 388 So.2d 985 (Ala. 1980); Perdue v.Mitchell, 373 So.2d 650 (Ala. 1979); Vintage Enterprises, Inc.v. Cash, 348 So.2d 476 (Ala. 1977).
The application of the rule in the factual context of this case is especially difficult for two reasons. First, the validity of Lessors' first claim — whether the lease expired at the end of the primary term — depends on what constitutes "drilling or reworking" operations and what constitutes a "capable well," terms heretofore not construed in Alabama case law. Furthermore, even assuming the invalidity of the voluntary pooling agreement, a question arises as to whether the 1975 forced pooling and integration order would render the issue of the validity of the voluntary agreement immaterial.
Secondly, as to Lessors' second claim — breach of implied covenants to protect against drainage and to reasonably develop — resolution of an arguable issue of law may moot the significance of any factual disputes. That question of law centers on whether Lessors' second claim is an impermissible collateral attack on the spacing orders of the Oil and Gas Board, which stated in its 1972 order setting up field *Page 1302 
spacing rules for the Big Escambia Creek Field that 640 surface acres was the maximum area which one well could efficiently and economically drain.
The trial judge, in granting the Lessee's motions for summary judgment on both the Lessors' counts, stated that "these activities constituted drilling or reworking operations within the meaning . . . of the lease." The judge went on to state that "Plaintiff's claim for drainage constitutes an impermissible collateral attack upon the orders of the Oil and Gas Board. . . ."
Applying the definition of drilling and reworking operations subsequently set out, we conclude the trial judge was correct in his determination that the activities which undisputedly took place constituted drilling or reworking operations.
Many oil, gas, and mineral leases now contain cessation of production clauses. These clauses generally provide for termination of the lease in the event that certain time periods expire without the operator or lessees having prosecuted "drilling" or "reworking" operations. Therefore, we intend to express guidelines as to what types of operations constitute drilling or reworking under Alabama law, but with the caveat
that each case must be determined by its own particular facts.
To state the obvious, the "act of boring a hole through which oil and/or gas may be produced if encountered in commercial quantities" is an operation which constitutes drilling. 8 Williams and Myers, Oil and Gas Law, Manual of Terms 205 (1981). Problems arise, however, when the activities of the operator are not tangibly connected with the well or unit in question.
In the leading Texas case, Gulf Oil Corp. v. Reid, 161 Tex. 51, 337 S.W.2d 267 (1960), the Texas Supreme Court held that the term "drilling" was intended to include all physical and mechanical aspects of securing oil and/or gas production in paying quantities, including connection of pipelines to the well or the extension of pipeline to some point where the product might be marketed. 337 S.W.2d at 270. Connection of pipeline is not what might be considered such a requisite operation to the actual boring of the hole to produce oil or gas, but in order to complete the task and provide the product to the purchaser, and ultimately to the consumer, such operations are necessary for the well to produce in "paying quantities."
Work done on the well or unit site in preparation for the actual drilling of the well has been held to be a part of drilling operations "when performed with the bona fide
intention to proceed thereafter with diligence toward the completion of a well." Sterling v. McKendrick, 134 So.2d 655,657 (La.App. 1961). The Sterling court refers to work intimate with the situs of the well when holding what activities of the operator constitute drilling operations. The undisputed activities that occurred in April and May 1979, on the Section 30 unit, coupled with the resultant production the following September, meet this test.
A more recent Oklahoma decision held that "sales contract negotiations and internal corporate authorization to rework do not constitute a `resumption of drilling operations' as that phrase is clearly referable to on-site drilling, and negotiations preparatory to that required activity will not save the lease" in light of a cessation of production clause.Hoyt v. Continental Oil Co., 606 P.2d 560, 564 (Okla. 1980).
This Oklahoma definition most closely approaches the guidelines which this Court, by its instant holding, prescribes as the test for determining what operations constitute "drilling" in this State. The key element is whether the operation is associated or connected with the physical site of the well or unit. In the case at bar, such on-site activities took place prior to the expiration of the primary term. Mere negotiations for purchases or subcontracts do not contribute to the physical efforts necessary to make the well capable of production. We emphasize, again, that each case must be taken on its own facts. Consequently, a lease agreement may dictate what operations, if any, are necessary to defeat a cessation of production clause. *Page 1303 
In establishing guidelines for what operations constitute "reworking" in Alabama, we follow the same logic as with "drilling." The crucial test which must be met for an activity to constitute reworking is whether the operation is associated or connected with the physical site of the well or unit. Additionally, the operation must be intimately connected with the resolution of whatever physical difficulty caused the well to cease production.
In Texas Co. v. Leach, 219 La. 613, 53 So.2d 786 (1951), the court held that the operator's efforts directed towards repairing a derrick on the well site, repairing tubing necessary to drilling, and strengthening and repairing bridges leading to the well site constituted operations for reworking. 53 So.2d 790, 791. If such repair work is actually necessary for the completion of onsite reworking, then it should be considered as part of the reworking operations of the well.
House v. Tidewater Oil Co., 219 So.2d 616 (La.App., 1969), addresses in great detail the issue of what constitutes operations for reworking. The court noted that reworking operations are not limited to activities which "affect the ability of the formation to feed into the well bore." In defining "reworking," however, the court limited that term to operations which take place on, or in close proximity to, the well site.
As with the guidelines we have established for operations which constitute "drilling," we determine "reworking" operations by whether the activity is associated or connected with the physical site of the well or unit. Consequently, operations or activities which are not designed to revitalize a well, or to restore lost production, do not constitute reworking.
In Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583
(1940), the Supreme Court of Louisiana held that "production" meant "production in paying quantities." Similarly, we hold that a "capable well" in this State is a well capable of producing oil or gas in paying quantities.
For purposes of maintaining a lease after expiration of the primary term, "paying quantities means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss." 8 Williams and Myers, Oil and Gas Law, Manual of Terms 580 (1981). In analyzing the duties of a lessee under express or implied covenants of a lease, production in paying quantities means "production in quantities sufficient to yield a return in excess of drilling, development and operation costs." 8 Williams and Myers, Oil and Gas Law, Manual of Terms 580 (1981). See Transport Oil Co. v. Exeter Oil Co.,84 Cal.App.2d 616, 191 P.2d 129 (1940); and Caldwell v. Alton OilCo., 161 La. 139, 143, 108 So. 314, 315 (1926).
We emphasize that our treatment of the "capable well" issue — a well capable of producing oil or gas in paying quantities — is limited to the context of the instant ease and is not necessarily to be given the same treatment in other contexts.
Here, our ruling upholding the trial court's granting of summary judgment is based upon two separate and distinct, yet interdependent, considerations: 1) whether the drilling or reworking which took place is to be considered as occurring on Lessors' land; and 2) our determination of the first inquiry, in turn, depends on whether all the interests in Section 30 were validly pooled.
We conclude that the 1975 forced pooling and integration orders render the validity of the voluntary agreement immaterial. This forced pooling order is still effective and achieves the same purpose as the voluntary pooling agreement would if it were effective. Because there was a valid pooling of interests in the Section 30 unit, and because drilling or reworking operations were commenced before the expiration of the primary term, the granting of summary judgment in favor of Lessees on the first count was proper.
Turning to Lessors' secondary claim (based upon alleged implied covenants *Page 1304 
of protection and drainage), we conclude the granting of summary judgment was improper in the factual context of this case. We hold that such claim is not an impermissible collateral attack on the orders of the Board.
Alabama Code 1975, § 9-17-12 (b), dealing with limitations as to rules, regulations, or orders limiting or prorating pool production, states that "[a] drilling or production unit, as contemplated in this subsection, means the maximum area which may be efficiently and economically drained by one well, and such unit shall constitute a developed unit as long as a wellis located thereon which is capable of producing oil or gas inpaying quantities. . . ." (Emphasis added.)
Whether the Section 30 well was capable of producing oil or gas in paying quantities is a disputed issue, and should be decided by the trier of fact in light of the considerations previously announced herein.
As concerns the implied covenant of protection, a disputed factual question is raised as to whether the drilling and reworking proceeded with reasonable haste, i.e., whether Exxon met the standard of a reasonably prudent operator under the same or similar facts and circumstances. For a good discussion of the reasonably prudent operator standard in relation to protection against drainage, see Amoco Production Co. v.Alexander, 622 S.W.2d 563 (Tex. 1981). See, also, 5 E. Kuntz, ATreatise on the Law of Oil and Gas § 61.3 (1978).
As concerns the implied covenant of protection, we adopt the following statements from Millette v. Phillips Petroleum Co.,209 Miss. 687, 48 So.2d 344 (1950), as the applicable legal principles:
 "There is an implied covenant in a lease of oil property that the lessee will do nothing to impair the value of the lease, and must use reasonable care to protect the lessor from damage or loss by the affirmative act of such lessee. This implied obligation has been extended to include, in the absence of express stipulation, a duty to drill offset wells if practicable and profitable. [Cites omitted.]
". . .
 "The payment and receipt of delay rentals is not a substitute for royalties. It is the consideration for delay in actual development. [Cites omitted.]
". . .
 "We are of the opinion that the acceptance of annual delay rentals, being knit to the duty to drill, and the right to delay operations, is apart from, and not relevant to, the duty to protect against drainage as such. Authorities which debate the existence of an estoppel against a demand for actual exploration are not found pertinent even as analogies." Millette, 209 Miss. at 703-705, 48 So.2d at 347-48.
See, also, Williams v. Humble Oil Refining Co., 432 F.2d 165
(5th Cir. 1970).
Judicial review of Board rules, regulations, and orders is specifically provided for by statute. Ala. Code 1975, § 9-17-15, enumerates five areas a reviewing court can consider, one of which is whether a rule, regulation, or order is reasonable. This section also states that any interested person aggrieved by any rule, regulation, or order made or promulgated by the Board shall institute a civil action within 30 days from the date of the order, rule, or regulation.
This does not mean, however, that these Lessors are now precluded from litigating the issue whether Lessees have acted as reasonably prudent operators pursuant to the Millette rule. Indeed, in the case at bar, the spacing order occurred back in 1972. The Section 30 unit was not even drilled until 1976, and the question of drainage is not alleged to have occurred until after December 21, 1977. To accord the Oil and Gas Board's express order the preemption status urged by Lessees would raise serious due process questions. The Millette principles speak clearly to that threat in their recognition of a civil remedy under prescribed circumstances.
We further observe that the lack of a genuine issue as to a material fact under Count 1 seeking cancellation does not of itself preclude all fact issues with respect to *Page 1305 
Plaintiffs' claim for damages, the test of the former being controlled by the terms of the lease and the pooling agreement, and the latter by the Millette reasonable operator rule.
Because there are genuine issues of material fact as to Lessors' alternative claim, we hold the granting of summary judgment as to this claim was improper.
We deem the remaining contentions made by the parties inappropriate for comment, and resolution of them must await a more fully developed factual record in which such issues and contentions arise.
This cause is remanded for a jury resolution of the genuine issues of material fact as to the claim for damages and for application of the legal principles announced herein.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
TORBERT, C.J., and MADDOX, FAULKNER, ALMON, SHORES, and EMBRY, JJ., concur.
BEATTY and ADAMS, JJ., not sitting.