Renee SERHIENKO; Ramona Romanyshyn; Kathryn Mularchek; Mercy Anheluk; Joseph Romanyshyn; and Joseph Romanyshyn as Trustee for Regina Romanyshyn and Roxanna Romanyshyn, minor children, Plaintiffs, Appellants, and Cross-Appellees,

v.

Russell L. KIKER, Jr., an individual; and Martin Oil Company, a foreign corporation, Defendants, Third Party Plaintiffs, Appellees, and Cross-Appellants,

and

Any unknown persons claiming any right, title or interest in any of the oil and gas in and under the following property in the County of Billings, and State of North Dakota: The South Half of the Northeast Quarter (S½NE¼) and the Southeast Quarter (SE¼) of Section Three (3); the South Half of the Northwest Quarter (S½NW¼) and the North Half of the Southwest Quarter (N½SW¼) of Section Ten (10); all in Township 143 North, Range 98 West of the 5th P.M., Defendants,

v.

GULF OIL CORPORATION, Third Party Defendant.

No. 11039.

Supreme Court of North Dakota.

Aug. 20, 1986.

Freed, Dynes, Reichert & Buresh, Dickinson, for plaintiffs, appellants, and cross-appellees; argued by George T. Dynes.

Bruce E. Bohlman, Grand Forks, for defendant, third party plaintiff, appellee, and cross-appellant Russell L. Kiker, Jr. Appearance by Marvin L. Kaiser, Williston.

Graybill & Craig, Wichita, Kan., for defendant, third party plaintiff, appellee, and cross-appellant Martin Oil Co. Appearance by J.B. Craig.

Pearce & Durick, Bismarck, for third party defendant. Appearance by Lawrence A. Dopson.

GIERKE, Justice.

The plaintiffs appeal from a judgment and amended judgment of the district court which dismissed their action seeking cancellation of two oil and gas leases and damages for slander of title. Defendants Russell L. Kiker, Jr., and Martin Oil Company (Martin) have cross-appealed from a portion of the amended judgment dismissing their counterclaims against the plaintiffs. We affirm in part, reverse in part, and remand for further proceedings.

The plaintiffs collectively own 240 of the mineral acres in Billings County described as follows:

"*Township 143 North, Range 98 West of the 5th P.M.*
"Section 3: S½NE¼, SE¼
"Section 10: S½NW¼, N½SW¼"

The oil and gas interests owned by the plaintiffs were leased to Kiker through two leases executed on October 6 and 7, 1977, for primary terms of five years and ten years, respectively. The controversy in this case centers upon a cessation of production clause contained in each lease. That clause states in pertinent part:

"If prior to discovery of oil or gas on said land, or on acreage pooled therewith, lessee should drill a dry hole or holes thereon, or if after discovery of oil or gas production thereafter should cease for any cause, this lease shall not terminate if lessee commences additional drilling or reworking operations within sixty (60) days thereafter, or (if it be within the primary term) commences or resumes the payment or tender of rental on or before the rental-paying date next ensuing after the expiration of three (3) months from the date of completion of a dry hole or cessation of production."

During August 1978 a producing well, known as the Symionow Well, was completed by Gulf Oil Corporation (Gulf) in Section 10 on property pooled by agreement of the plaintiffs. The Symionow Well was a marginal producer. On June 27, 1980, still within the primary term of both leases, production from the Symionow Well ceased. During a two-week period in July 1980, Gulf conducted tests on the Symionow Well. This operation included pulling the tubing and running a pipe inspection log. Gulf determined that serious casing leaks existed which prevented the well from producing oil and gas. This problem was similar to that encountered by Gulf with other wells it operated in the Little Knife Field. On July 29, 1980, Gulf removed the workover rig from the Symionow Well site and, except for routine maintenance visits by the pumper, all physical activity on the site ceased for approximately seven and one-half months. No delay rental payments were tendered on or before October 6 or 7, 1980, the anniversary dates of the leases.

After evaluating the test data, Gulf decided in October 1980 to develop a special casing liner as a possible remedy, a technique that previously had not been used in the Little Knife Field. Gulf decided to install the liner in a well known as the Kostelnak Well, which had problems similar to those encountered with the Symionow Well, to test whether the liner concept was feasible from an engineering standpoint. The Kostelnak Well, in which the plaintiffs had no interest, was chosen by Gulf for installation of the liner because of its greater producing capacity and because Gulf was the only working interest holder, thereby obviating the need for obtaining consent from other parties.

In late December 1980 and early January 1981, Kiker tendered delay rental payments to the plaintiffs, which they refused to accept and returned to him. By mid-January 1981, the special liner had arrived and Gulf installed it in the Kostelnak Well, but because of other problems at the well site, production was not restored. Gulf, however, determined that the concept of the liner was feasible and could be used in the other wells located in the Little Knife Field.

During March 1981, Gulf returned to the Symionow Well and attempted to perforate another zone to determine whether sufficient additional quantities of oil and gas could be recovered to justify the cost of installing the special liner to correct the casing leaks. Pumping operations were continued until May 3, 1981, when Gulf determined that no oil or gas could be obtained from the additional zone. No liner was installed and the Symionow Well was abandoned. In the meantime, Martin, pursuant to a farm-out agreement with Kiker, had staked a well on March 12, 1981, in Section 3 on lands pooled by agreement of the plaintiffs. The well was completed on August 1, 1981, and it produced oil in commercial quantities.

The plaintiffs, in February 1981, served written demands upon Kiker and Martin pursuant to § 47–16–36, N.D.C.C., that the two oil and gas leases be released of record. Kiker and Martin replied pursuant to the statute and asserted that the leases were in full force and effect. The plaintiffs instituted the present action against Kiker and Martin in September 1981 seeking cancellation of the leases and damages for slander of title. The plaintiffs claimed that the leases expired by their own terms because of the failure to timely pay delay rentals. Kiker and Martin asserted that the leases remained in effect because reworking operations were commenced within 60 days after the Symionow Well ceased

production, and counterclaimed for damages for malicious prosecution. Kiker and Martin also brought a third-party action against Gulf seeking contribution or indemnity and asserting negligence in its operation of the Symionow Well.

Following a bench trial on the issue of liability alone,[1] the trial court dismissed the plaintiffs' action. The court determined that, "as a matter of law, 'reworking operations' as contemplated in the leases commenced" on the Symionow Well within 60 days from the date that production ceased; that the actions of Gulf "were those of a prudent operator" and that Gulf "exhibited good faith and a bona fide intent to restore production" of the well; that reworking operations included "the testing and evaluation of the casing problems" on the Symionow Well and "the efforts of Gulf to determine the engineering feasibility of a liner in the Little Knife Field that could be used" on the well; that the "subsequent determination of engineering feasibility and recompletion of the well constituted additional reworking operations in an attempt to restore production;" and that Gulf's reworking operations "held the ... leases through the time that operations were commenced by Martin ... which culminated in a producing oil well in Section 3, ..." In a subsequent separate order incorporated into the amended final judgment, the court granted the plaintiffs' motion for partial summary judgment dismissing Kiker and Martin's counterclaims for malicious prosecution. The court also dismissed as moot Kiker and Martin's third-party action against Gulf. These appeals followed.

■ The oil and gas leases involved in this case are "unless" leases.[2] An "unless" clause does not obligate the lessee to do an act but provides that the lease shall terminate unless the lessee does some act. The "unless" clause does not state a condi-

---

1. The trial court bifurcated the liability and damage questions and also left for later consideration the counterclaims of Kiker and Martin against the plaintiffs as well as the third-party actions against Gulf.

2. Contrary to the assertion of Kiker and Martin, the leases involved in this case are not "drill or pay" leases. *See* 8 H. Williams and C. Meyers, Oil and Gas Law, Manual of Terms, 251–252, 905–906, 941 (1984).

tion subsequent upon which the lease may be forfeited, but it is construed as a clause of special limitation and if delay rental payments required by the lease are deficient in either time or the amount of payment, the lease terminates automatically, without any requirement of notice or demand on the part of the lessor. *Borth v. Gulf Oil Explor. & Prod. Co.*, 313 N.W.2d 706, 709 (N.D.1981); *Norman Jessen & Assoc. v. Amoco Prod. Co.*, 305 N.W.2d 648, 651 (N.D.1981); *Schwartzenberger v. Hunt Trust Estate*, 244 N.W.2d 711, 716 (N.D.1976); *Schank v. North American Royalties, Inc.*, 201 N.W.2d 419, 426 (N.D. 1972); *Woodside v. Lee*, 81 N.W.2d 745, 746 (N.D.1957). Likewise, the 60–day clause at issue in this case, which is commonly found in "unless" lease forms [*see* 8 H. Williams and C. Meyers, Oil and Gas Law, Manual of Terms, 905–906 (1984) ], is also a clause of special limitation and a failure to comply with its terms results in the automatic termination of the lease. *See Taylor v. Buttram*, 111 So.2d 576, 579 (La.Ct.App.1959); *Miami Oil Producers, Inc. v. Larson*, 203 Mont. 225, 661 P.2d 1260, 1263 (1983); *Hall v. McWilliams*, 404 S.W.2d 606, 608 (Tex.Civ.App.1966); 3 H. Williams, Oil and Gas Law § 615.5(3) (1985). There is no dispute in this case that the tender of delay rental payments was untimely. Thus, the leases terminated automatically unless the lessee commenced "reworking operations" within 60 days after the Symionow Well ceased production.

This court has never before considered the meaning and application of the term "reworking operations" as used in lease provisions in the oil and gas industry. Decisions from other jurisdictions demonstrate that an exact definition of "reworking operations" applicable under all circumstances is difficult to formulate. *See* 8 H. Williams and C. Meyers, Oil and Gas Law, Manual of Terms, 758–759 (1984). In *Lone*

*Star Producing Company v. Walker*, 257 So.2d 496, 500 (Miss.1971), the court stated:

"It would be difficult, if not impossible, to formulate a rule that would with exactness define reworking operations such as those contemplated by the terms of the leases in question because the problems of capturing and producing oil and gas located thousands of feet below the surface of the earth are many and varied. Reworking operations may encompass testing, evaluation and other acts performed necessary to reworking a given well, and each case will have to be considered in the light of facts peculiar to that operation. One of the prime requirements is that the acts of the operator constitute a bona fide effort to rework a given well."

An often-cited, rather broad, definition of the term is found in *Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311, 313–314 (1953):

" ' "[R]e-working operations," as used herein, means actual work or operations which have theretofore been done, being done over, and being done in good faith endeavor to cause a well to produce oil and gas or oil or gas in paying quantities as an ordinarily competent operator would do in the same or similar circumstances.' " [3]

In *Sheffield v. Exxon Corp.*, 424 So.2d 1297, 1303 (Ala.1982), the court, concluding that principles for determining what constitutes "drilling operations" are applicable for determining what constitutes "reworking operations" in lease provisions, offered the following definition:

"The crucial test which must be met for an activity to constitute reworking is whether the operation is associated or connected with the physical site of the well or unit. Additionally, the operation must be intimately connected with the

---

**3.** The definition of "reworking operations" in *Rogers v. Osborn*, 152 Tex. 540, 261 S.W.2d 311 (1953), came from a jury instruction which was not objected to at trial. The Texas Supreme Court neither approved nor disapproved of the trial court's definition of the term, cautioning that the instruction "would include almost any type of work." *Rogers, supra*, 152 Tex. at 544, 261 S.W.2d at 313.

resolution of whatever physical difficulty caused the well to cease production.

\* \* \* \* \* \*

"Consequently, operations or activities which are not designed to revitalize a well, or to restore lost production, do not constitute reworking."

■ From our review of the case law on the subject, certain guidelines appear to be fairly well established. While it is clear that routine maintenance procedures, such as the periodic starting of the pump on the lease to keep it in running operation, do not constitute reworking operations [*Hall v. McWilliams*, 404 S.W.2d 606, 609 (Tex.Civ. App.1966) ], testing and other essential preparatory steps conducted on the well site and directly related to resolving the difficulty can constitute under certain circumstances the commencement of reworking operations. *Jardell v. Hillin Oil Co.*, 485 So.2d 919, 925 (La.1986). However, inherent within the concept of "reworking operations" is a duty to continue operations with due diligence after "commencement;" the activities must be conducted in a bona fide effort to restore the well to production as soon as possible. *See Jardell, supra; Johnson v. Houston Oil Company of Texas*, 229 La. 446, 86 So.2d 97, 99 (1956); *Texas Co. v. Leach*, 219 La. 613, 53 So.2d 786, 791 (1951); *House v. Tidewater Oil Company*, 219 So.2d 616, 623 (La.Ct.App. 1969); *Bell v. Mitchell Energy Corp.*, 553 S.W.2d 626, 632 (Tex.Civ.App.1977). In other words, minimal preparatory steps taken within the 60–day period followed by a lengthy period of inaction would not constitute the "commencement" of reworking operations. *Cf. Herl v. Legleiter*, 9 Kan. App.2d 15, 668 P.2d 200, 203 (1983).

■ Furthermore, a lessee's intent to continue reworking operations after commencement must be unqualified, and not dependent upon the happening of certain contingencies. *Cf. True Oil Company v. Gibson*, 392 P.2d 795, 799–800 (Wyo.1964). Thus, an intent to continue operations if favorable information is gained from operations conducted on another well, or if favorable financial arrangements can be made, is not sufficient. *Cf. Geier-Jackson, Inc. v. James*, 160 F.Supp. 524, 530 (E.D.Tex. 1958).[4]

■ In the present case, following the two-week testing operations conducted on the Symionow Well in July 1980, no physical activity occurred at the well site until mid-March 1981. In the interim, Gulf's intent to continue any further operations on the Symionow Well was conditional. Indeed, Gulf did not reach a decision to take any further action with regard to the Symionow Well until February 1981. It is clear from the record that continuance of operations on the Symionow Well was dependent upon two contingencies: the special casing liner would have to be tested and found successful in the Kostelnak Well, in which the plaintiffs had no interest, and if the liner was successful, Gulf would have to locate and establish more production from a lower zone in the Symionow Well to economically justify the placement of the liner in the well.[5] While Gulf's decision to test

---

4. Although the decisions in *True Oil Company v. Gibson*, 392 P.2d 795 (Wyo.1964), and *Geier-Jackson, Inc. v. James*, 160 F.Supp. 524 (E.D.Tex. 1958), relate to the term "drilling operations" as used in express lease clauses, we believe that the underlying rationale is equally applicable to the term "reworking operations." *See Sheffield v. Exxon Corp.*, 424 So.2d 1297, 1303 (Ala.1982).

  We further note that this court's recent decision in *Johnson v. Hamill*, 392 N.W.2d 55, Civil No. 11,072 (N.D.1986), has no application to the present case. In *Hamill*, this court addressed a lessee's duties under the implied covenant of reasonable development. We are not here concerned with implied covenants in an oil and gas lease, but with the interpretation of an express lease provision covering cessation of production.

5. During the trial, the following colloquy occurred between counsel for the plaintiffs and Edward A. McKinnon, the Williston Basin project manager for Gulf:

  "Q [By Mr. Dynes]: Now, is it correct then that with, for the Symionow Well to have been reworked in this fashion, you needed two things? You needed a success picture on the liner in Kostelnak and you had to find some more production in that lower zone in the Symionow Well?

  "A [By Mr. McKinnon]: Yes.

the liner on the Kostelnak Well before arriving at a decision on what course to take with regard to the Symionow Well might very likely have been reasonable and prudent from an overall economic standpoint, its actions did not comply with the 60–day provision of the leases covering the Symionow Well. "The prudent-operator standard ... is inapplicable to operations necessary to keep a lease alive under a special limitation or condition." 5 H. Williams and C. Meyers, Oil and Gas Law § 808, at p. 57 (1985). *See also Trinidad Petroleum v. Pioneer Natural Gas,* 416 So.2d 290, 297–298 (La.Ct.App.1982).

Under the circumstances, operations conducted on the Kostelnak Well as a preliminary contingency to taking any further action on the Symionow Well did not constitute the diligent prosecution of efforts to restore the Symionow Well to production as soon as possible. Thus, because the preliminary testing conducted on the Symionow Well was not followed by diligent prosecution of efforts to restore the well to production, those testing activities did not constitute the "commencement" of reworking operations within the meaning of the 60–day clause in the leases. Consequently, we conclude that, as a matter of law, the trial court erred in determining that reworking operations on the Symionow Well were commenced within 60 days after production ceased.

"Q And the order was this, wasn't it that you tried it with Kostelnak to see whether the liner would work?
"A That's correct.
"Q Because if it didn't work then you forget about Symionow?
"A That's right.
"Q And then if it did work, then the next step was to get the second area of production in Symionow?
"A That's right.
"Q So that you could increase the taking of oil out of that well?
"A Correct.
"Q So what actually happened then was that although the Kostelnak Well wasn't rejuvenated, you passed the first stage and you were satisfied that another liner would work in another well in the Little Knife?
"A Yes.

We note, as did the court in *Jardell, supra,* 485 So.2d at 925, that "[o]ur determination is based on the definition of 'reworking' derived from earlier jurisprudence as well as our analysis of the terms of the cessation of production clause of the mineral lease. It is not dependent on expert testimony, ..."

Kiker and Martin have raised numerous equitable defenses to cancellation of the leases which the trial court did not rule upon in view of its disposition of the case. This court has held that equitable relief under certain circumstances may be applied to prevent the automatic termination of an "unless" lease. *E.g., Borth v. Gulf Oil Explor. & Prod. Co.,* 313 N.W.2d 706, 709 (N.D.1981), and cases cited therein. We therefore remand to the trial court for consideration of Kiker and Martin's equitable defenses.

In their cross-appeals, Kiker and Martin assert that the trial court erred in dismissing their action for malicious prosecution.[6] A party alleging malicious prosecution of a civil action has the burden of establishing that the other party instituted the action with malice and without probable cause. *Nisewanger v. W.J. Lane Co.,* 75 N.D. 448, 28 N.W.2d 409 Syllabus 1 (1947). Probable cause exists if the party instituting the action believes and has reasonable ground to believe that his action and the means taken in prosecuting it are legally just and proper. *Nisewanger, supra,* Syl-

"Q Then you went to try to get the additional production in Symionow and it didn't work?
"A That's correct.
"Q It was unsuccessful?
"A Yes.
"Q So, because of that, you never even attempted to put a liner in the Symionow Well?
"A That's correct."

6. The trial court also dismissed Kiker's counterclaim against Joseph Romanyshyn for breach of warranty. Kiker has neither briefed nor argued this issue, and we therefore deem it abandoned. *See City of Fargo v. Windmill, Inc.,* 350 N.W.2d 32, 35 (N.D.1984).

We further note that generally, a malicious prosecution action is premature when it is instituted as a counterclaim to a pending civil proceeding. *See Farmers Elevator Company v. David,* 234 N.W.2d 26, 33–34 (N.D.1975).

labus 3. In *Root v. Rose*, 6 N.D. 575, 72 N.W. 1022 (1897), this court held that, as a general rule, probable cause is conclusively established when the party who instituted the proceeding alleged to have been brought without probable cause is successful in the trial court, even though that decision is ultimately reversed on appeal. *See also* Annot., 58 A.L.R.2d 1422, 1430–1431 (1958).[7] We believe the same principle is applicable when, as in this case, the party who instituted the proceeding is successful on appeal though not at trial. We therefore conclude that the trial court did not err in dismissing the malicious prosecution action.

 The plaintiffs assert that the trial court erred in dismissing their slander of title action against Kiker and Martin. In order to maintain an action for slander of title, it must be shown that the defendant acted maliciously. *Briggs v. Coykendall*, 57 N.D. 785, 790, 224 N.W. 202, 204 (1929). There can be no malice in the legal sense required to sustain an action for slander of title when defendants have color of title and have a bona fide belief therein. *Briggs, supra,* 57 N.D. at 790, 224 N.W. at 205. It has also been stated that "the courts are agreed that the act of recordation is not actionable as slander of title if the defendant acted in the reasonable belief that he had in fact a valid claim against the property which he was entitled to record." Annot., 39 A.L.R.2d 840, 846–847 (1955) (Footnote omitted). We believe that the rationale of the court in *Rose, supra,* is equally applicable to the plaintiffs' claim for slander of title. The trial court ruled, in favor of Kiker and Martin, that the leases remained in full force and effect. We have reversed that determination of the trial court. Applying the rationale in *Rose, supra,* the plaintiffs cannot prevail on their slander of title action as a matter of law.

Accordingly, we affirm the trial court's dismissal of the plaintiffs' slander of title

action and Kiker and Martin's counter-claims; we reverse the trial court's dismissal of the plaintiffs' action seeking cancellation of the oil and gas leases; because Kiker and Martin's third-party action against Gulf is no longer moot, we reverse the trial court's dismissal of that action; and we remand to the trial court for consideration of Kiker and Martin's equitable defenses to cancellation of the leases. No costs are allowed on the appeal.

ERICKSTAD, C.J., and MESCHKE, LEVINE and VANDE WALLE, JJ., concur.

---

7. This general rule is not applicable if the initial judgment against the person bringing the malicious prosecution action "was obtained by fraud, perjury, or other improper means, ..." Annot., 58 A.L.R.2d 1422, 1431 (1958) (Footnote omitted).