484 N.W.2d 102 (1992)
In the Matter of the Application for DISCIPLINARY ACTION AGAINST Marvin L. KAISER, a Member of the Bar of the State of North Dakota.
DISCIPLINARY BOARD OF the SUPREME COURT OF the STATE OF NORTH DAKOTA, Petitioner,
v.
Marvin L. KAISER, Respondent.
Civ. No. 900393.
Supreme Court of North Dakota.
April 21, 1992.
Vivian E. Berg (argued), Bismarck, for petitioner.
Serkland, Lundberg, Erickson, Marcil & McLean, Ltd., Fargo, for respondent; argued by Ronald H. McLean.
Dean Winkjer (appeared), Williston, amicus curiae.
PER CURIAM.
Attorney Marvin L. Kaiser twice violated the Code of Professional Responsibility by two episodes of testifying falsely under oath. We suspend Kaiser from the practice of law for two years.
In September 1989, a formal disciplinary action began against Kaiser for testifying falsely at a 1977 trial. After a hearing panel of the Disciplinary Board met, but before it acted, another complaint of false testimony at a 1985 trial was received. After the panel considered this added complaint, the panel recommended in November 1990 that Kaiser be publicly reprimanded. Kaiser and Disciplinary Counsel submitted a stipulation for a public reprimand to this court.
We rejected the stipulation and referred the matter to a Special Master. In November 1991, the Master recommended that Kaiser be publicly reprimanded and assessed costs. We ordered briefs and arguments on the question of sanctions. We now conclude that Kaiser's repeated false testimony requires a two-year suspension from the practice of law.

I.
In 1976, Kaiser agreed to a secret joint venture with Russell Kiker, Duane Peterson, and William D. Walters Sr. (Kaiser's father-in-law) to invest in oil and gas properties in the Williston Basin. They agreed to conceal the existence of the venture. Kiker v. Walters, 482 N.W.2d 626 (N.D. 1992) (Meschke, Justice, dissenting), outlines the workings of this venture. Although profits were to be shared variously based on individual contributions to capital, all investments were to be made in Kiker's name, not Kaiser's.
In January 1977, Kiker, for himself, Walters, and Kaiser purchased twenty mineral acres in Dunn County from Pete and Lillian Glovatsky. On the same day, Kiker leased the mineral rights to Target Energies, Inc., a corporation held solely by Kaiser. Target immediately recorded its lease.
The William Herbert Hunt Trust Estate had obtained a ten-year oil and gas lease from the Glovatskys in 1972, covering land in both Dunn and McKenzie Counties. The Hunt Trust had recorded its lease in McKenzie County but, through inadvertence, failed to record its lease in Dunn County until the day after Kiker purchased the minerals from Glovatsky and leased them to Target.
The Hunt Trust sued Kiker and Target, seeking to establish the priority of its lease. The litigated question was whether Kiker and Target acquired their interests in the Glovatsky property without notice of *103 the Hunt Trust's lease. At the trial in June 1977, when asked by counsel for the Hunt Trust, Kaiser testified:
Q: Have you ever been a partner with Mr. Kiker or entered into any joint ventures with him?
A: No.
The answer was false.
Kaiser insists that his false testimony was prompted by "pep talks" from Walters Sr. to remember his "duty to the Walters family" and "the harmful things which the Hunts had allegedly done" to Walters Sr. during a previous "run-in" where Walters Sr. "felt that he had been taken advantage of." Kaiser admits, however, "I fully knew that I was making a false statement regarding our relationship."
Had Kaiser testified truthfully, Kiker's knowledge of the Hunt Trust's lease would have been imputed to Kaiser and Target as partners. Instead, from Kaiser's false testimony, the trial court concluded that Kiker and Target were bona fide purchasers for value without notice of the prior Hunt Trust lease, and that the Hunt Trust lease was subordinate.
On appeal, this court concluded that "Kiker is not a good faith purchaser without notice of Hunt's oil and gas lease and that Kiker's mineral deed is subject to Hunt's oil and gas lease...." Hunt Trust Estate v. Kiker, 269 N.W.2d 377, 382 (N.D. 1978). Still, this court understood:
It is undisputed that Kaiser was not informed by Kiker that Pete Glovatsky had told Kiker the NW¼ of Section 19 was leased to someone else. It is also undisputed that Kiker did not mention Hunt's name to Kaiser, nor did he tell Kaiser about the rental receipts which the Glovatskys had displayed to Kiker...."
Hunt Trust Estate, 269 N.W.2d, at 379. Without knowledge of the secret venture between Kiker and Kaiser, this court deemed Kaiser an "[i]nnocent agent of [a] guilty principal."
Although there very well may have been an attorney-client relationship between Kiker and Kaiser for the purpose of having Kaiser perform title investigations for Kiker, there is no evidence to support Hunt's assertion that the lease executed between Kiker and Target was not a bona fide arm's length transaction. Consequently, there is no legal basis upon which the knowledge Kiker possessed, upon executing the oil and gas lease with Target, can be imputed to Kaiser or to Target.
Hunt Trust Estate, 269 N.W.2d, at 383. Accordingly, this court concluded that
Target is a good faith purchaser for value without notice of the prior oil and gas lease executed between Hunt and the Glovatskys ... and that Target's lease is not subject to Hunt's lease.
269 N.W.2d at 385. Kaiser's false testimony tipped the scales of justice in favor of himself and his secret partners.
Thereafter the Glovatsky oil and gas was successfully developed by Target for Kiker, Walters Sr., and Kaiser. Kaiser began receiving checks from his share of the venture in 1979, and earned "approximately $600,000" from his share of this investment alone.

II.
Kaiser reports feeling "dirty" after his false testimony. In 1981, he became "extremely upset" and disclosed the perjury to his wife, Lillian Walters Kaiser. The marriage became shaky and, in 1986, Kaiser sued Lillian for a divorce.
About this same time, Kaiser and Kiker consulted a Fargo attorney to consider settlement with the Hunt Trust. Kaiser says that he was advised to attempt a settlement with the Hunt Trust only in cooperation with his joint venturers. To do so otherwise would have hazarded his liability to his partners for revealing the conspiratorial venture, Kaiser says, although he has not fully described the legal theory or factual scope of that hazard. Because the divorce was pending, Walters Sr. would not cooperate. Therefore, Kaiser says, he held off on contacting the Hunt Trust.
While the divorce was pending, Lillian threatened to expose Kaiser's false testimony. Two weeks before trial, Kaiser claimed the Fifth Amendment when asked *104 about the subject in a deposition. Shortly before the divorce trial, Lillian disclosed the existence of the secret joint venture in her pretrial brief. For an account of the following disputes in the divorce, see Kaiser v. Kaiser, 474 N.W.2d 63 (N.D.1991). At the October 1988 divorce trial, Kaiser admitted testifying falsely in the Hunt Trust trial in 1977.
In a November 22, 1988 letter, shortly after the divorce trial began, Kaiser's counsel reported his 1977 false testimony to the Disciplinary Board. Kaiser, with Kiker, then approached the Hunt Trust and admitted the false testimony. In December 1988, Kaiser settled with the Hunt Trust, paying more than $300,000 and deeding his Glovatsky interests to the Hunt Trust.
In December 1988, too, Kaiser sought to minimize any disciplinary sanction by submitting an affidavit to the Disciplinary Board that consented to a private reprimand. See North Dakota Procedural Rules for Lawyer Disability and Discipline 4.2 (NDPRLDD), North Dakota Century Code, Court Rules Annotated, at 975 (1992-1993 ed.). In February 1989, the Disciplinary Board refused to accept this consent. The Board referred both Kaiser's self-report and another complaint about the same false testimony, filed by a former law partner, to the Inquiry Committee West for investigation. After an informal appearance by Kaiser with counsel in June 1989, the Committee recommended formal disciplinary action.
The formal action was begun. Kaiser answered, acknowledged that he violated the Code of Professional Responsibility, and urged the Board to consider mitigating circumstances. The matter was referred to a three-member hearing panel. The panel met in September 1989 and heard testimony from Kaiser. Before the panel acted, an additional complaint of another episode of false testimony was filed against Kaiser.

III.
In January 1990, another attorney complained to the Disciplinary Board that Kaiser testified falsely at a trial on March 21, 1985 in a Billings County case (identified as the Romanyshyn litigation). Again, Kiker had recorded oil and gas leases on the Romanyshyn minerals there disputed, secretly holding for himself, Walters Sr., and Kaiser. The Romanyshyn heirs sued Kiker and his assignee, Martin Oil Company, to cancel the leases to Kiker because production had ceased and reworking operations were not timely. Kaiser appeared as one of the attorneys for Kiker, but was called as an adverse witness by the attorney for the Romanyshyn heirs. During his testimony, Kaiser was asked:
Q: You don't have any interest in this particular property though, do you, that's involved in this case?
A: No.
Again, the answer was false.
After trial, the trial court denied the claim of the Romanyshyn heirs against Kiker for cancellation of the leases. On appeal, we reversed that part of the judgment and remanded for consideration of Kiker's and Martin's equitable defenses to cancellation of the leases. See Serhienko v. Kiker, 392 N.W.2d 808 (N.D.1986). The attorney for the Romanyshyn heirs showed the hearing panel that the heirs succeeded in terminating Kiker's leases after remand and that the heirs obtained a judgment for over $100,000 in damages. The attorney for the Romanyshyn heirs testified: "I think [Kaiser's] testimony was quite influential in the decision made by" the trial court that was appealed and reversed.
Unlike the 1977 false testimony, however, the 1985 false testimony did not control the outcome of the case. Kaiser lied, he says, because he felt "trapped" and "compelled to give testimony consistent with his 1977 testimony."

IV.
The Disciplinary Board referred the complaint about the 1985 false testimony to the Inquiry Committee West. After that Committee's investigation and report to the Disciplinary Board, the Board delegated the complaint to its hearing panel for formal action with the earlier self-report and complaint of the 1977 false testimony. The *105 panel heard further testimony and recommended that Kaiser be privately reprimanded. In October 1990, the Disciplinary Board considered the recommendation of the hearing panel.
The Board found that Kaiser testified falsely on two separate occasions, both violating the Code of Professional Responsibility, but also found mitigating factors. The Board concluded that, ordinarily, the misconduct would warrant disbarment. However, the Board concluded that, because "there were substantially mitigating circumstances," a public reprimand was in order. Accordingly, the Board recommended that this court publicly reprimand Kaiser. In December 1990, Kaiser offered a stipulation, joined by Disciplinary Counsel, consenting to a public reprimand.
This court considered the recommendations of the Disciplinary Board, rejected Kaiser's consent and, in early 1991, referred the matter to a Special Master pursuant to NDRCivP 53 and NDPRLDD 3.5. The Master, Honorable Norman J. Backes, conducted a hearing and, in November 1991, issued his findings and recommendations.
The Master found that Kaiser had made a "false statement concerning material information with the intent to deceive the court", and that Kaiser "maintained the deception" in 1985, but "not with the same... significant effect upon the legal proceedings." The Master concluded that Kaiser had violated the Code of Professional Responsibility.[1] The Master found circumstances that mitigated the misconduct and recommended a public reprimand and assessment of costs.
This court considered the recommendations of the Special Master, and then ordered Kaiser and Disciplinary Counsel to file briefs and to present oral arguments "at which the appropriate Standards for Imposing Lawyer Sanctions are to be addressed."

V.
Our review of a disciplinary action against an attorney is anew on the record with the standard of proof being clear and convincing evidence. Matter of Disciplinary Action Against Larson, 450 N.W.2d 771, 773 (N.D.1990). We accord due weight to the findings, conclusions, and *106 recommendations of the hearing panel and Disciplinary Board, as well as to the findings and recommendations of the Special Master. See Matter of Ellis, 439 N.W.2d 808, 809 (N.D.1989). In determining what discipline is warranted for a wayward attorney, this court is not a "rubber stamp" for the recommendations of the Disciplinary Board. Disciplinary Board of the Supreme Court v. O'Neil, 326 N.W.2d 879 (N.D.1982). The sanction in each case is determined independently on the facts of that case. Id.
In this case, we agree that Kaiser has admitted repeatedly violating the Code of Professional Responsibility by twice testifying falsely. We disagree, however, with the proposed sanctions recommended by the Disciplinary Board and by the Special Master.

VI.

A. Standards.

The North Dakota Standards for Imposing Lawyer Sanctions (NDSILD) were adopted by this court in 1988 from the American Bar Association's suggested Standards of Imposing Lawyer Sanctions (February 1986). See NDCC, Court Rules Annotated, at 1007. We treat the Standards as guidelines for assigning a sanction for particular misconduct. NDSILD 1.3. Sanctions are imposed for violations of the Code of Professional Responsibility or the Rules of Professional Conduct when shown by clear and convincing evidence. Id. Kaiser has admitted violating the Code of Professional Responsibility. See n. 1.
The Standards instruct that certain factors are to be considered in arriving at an appropriate sanction. NDSILD 3.0. These factors include the nature of the duty violated, the lawyer's mental state, the potential or actual injury caused by the misconduct, and the existence of aggravating or mitigating circumstances.
When Kaiser made a materially false statement under oath in 1977, he violated his duty to the legal system. NDSILD 6.0.[2] Kaiser did so knowingly, "with the intent to deceive the court." NDSILD 6.11 and 6.12. His first false statement caused a "significant adverse effect on the legal proceeding," producing actual, serious, and long-lasting injuries. Id. The seriousness is aggravated by the second false statement eight years later in 1985. NDSILD 9.2(d). Aggravated and serious misconduct calls for a substantial sanction.
Because NDSILD 6.0 declares that disbarment is generally appropriate for false testimony under oath, Kaiser would ordinarily be disbarred. NDSILD 6.11. Still, the Standards say that both aggravating and mitigating circumstances may be considered *107 when determining what sanction to impose. NDSILD 9.1, 9.2 and 9.3.[3]
The Special Master found several factors that mitigate Kaiser's misconduct. These circumstances include that Kaiser's "misconduct was ... an isolated incident and not a pattern of dishonest behavior;" "misconduct was ... unlikely to recur;" "no prior disciplinary record," (see NDSILD 9.32(a)); "misconduct ... motivated primarily... out of an inappropriate sense of family loyalty," (see NDSILD 9.32(b) and (c)); "timely restitution to rectify the consequences of ... misconduct;" "fully cooperated" with the Board, (see NDSILD 9.32(d)); "voluntary disclosure of ... misconduct," (see NDSILD 9.32(e)); "community... reputation of good character," (see NDSILD 9.32(g)); and "remorse," (see NDSILD 9.32(l)). However, we conclude that these mitigating factors are balanced to a great extent by significant aggravating factors that the hearing panel, the Disciplinary Board, and the Special Master failed to address.
Kaiser's first episode of false testimony in 1977 had a profound effect on the outcome of that litigation, and on the decision by this court in that litigation. Because of Kaiser's false testimony, the Hunt Trust lost its rights to the Glovatsky oil and gas that later yielded profits of nearly two million dollars to Kaiser and his partners. In spite of Kaiser's individual restitution, the Hunt Trust is still engaged in litigation seeking to recoup its remaining losses from other secret partners. See Kiker v. Walters, 482 N.W.2d 626. Although Kaiser argues that inappropriate family loyalties induced him to lie under oath, we believe that the possible profit potential was an equally motivating factor. See NDSILD 9.22(b). A dishonest or selfish motive is a seriously aggravating factor.
There are other aggravating factors, too. Kaiser repeated the lie in 1985 while testifying under oath in the Romanyshun litigation. It is of concern to us that both Kaiser and Disciplinary Counsel argue that Kaiser's false testimony was immaterial to the outcome of the Romanyshyn litigation, and therefore, somehow less important. Neither Kaiser nor Disciplinary Counsel seems to fully appreciate the wrongful nature of Kaiser's misconduct.
*108 "Truth and candor are synonymous with justice, and honesty is an implicit characteristic of the legal profession." ABA, The Judicial Response to Lawyer Misconduct, III.1, III.3 (1984). The primary function of our judicial system is to find the truth to reach a just conclusion. See Dodd v. The Florida Bar, 118 So.2d 17 (Fla.1960) (Disbarment for urging and advising clients to give false testimony). See also Matter of Malloy, 248 N.W.2d 43, 46 (N.D.1976) ("`All perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth,'" quoting In re Michael, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30 (1945)). Our courts are almost "wholly dependent on members of the bar to marshal and present the true facts...." Dodd, at 19. We believe that any intentionally false statement by an attorney while testifying under oath, whether material or not, is an extremely serious breach of professional ethics. See also NDSILD 9.22(d) (multiple offenses) and 9.22(g) (refusal to acknowledge wrongful nature of conduct) for additional aggravating circumstances. Kaiser's second episode of false testimony eight years later during the Romanyshun litigation significantly aggravates Kaiser's misconduct.
The final aggravating factor is Kaiser's substantial experience in the practice of law. NDSILD 9.22(i). Kaiser had been a practicing attorney for nine years when he testified at the Hunt Trust trial, and seventeen years when he testified at the Romanyshyn trial. After so many years of practice, there is no question that he knew better.

B. Public Harm.

Kaiser's conduct was also criminal.[4] Kaiser has admitted that he was concerned about the criminal penalties, stating that he had done "research with respect to North Dakota statutes on perjury ... [and knew] that the statute of [limitations for] perjury was three years...." Kiker v. Walters, (Tr. of Kaiser's testimony October 4-5 (1990)). Because he has not been convicted of any crime, however, Kaiser argues that he should not be disbarred or suspended.
We believe that it is immaterial that Kaiser was not criminally charged with perjury or giving false testimony. A criminal conviction is not "a condition precedent to a discipline proceeding when the facts themselves warrant discipline." Committee on Professional Ethics and Conduct of the Iowa State Bar Association v. Williams, 473 N.W.2d 203, 206 (Iowa 1991). Escaping criminal charges because the statute of limitations has expired does not lessen the seriousness of the misconduct. The criminal character of the misconduct is one measure of the public harm.
The primary purpose of a disciplinary action is not to punish the lawyer, but to shield the public from the lawyer who is not worthy of public trust. The court is "vested with the duty of maintaining the integrity of the legal profession," and must determine if the public interest is served by allowing the lawyer to continue practicing. See Matter of Maragos, 285 N.W.2d 541, 545 (N.D.1979). Kaiser's deliberate false *109 testimony under oath is clearly "contrary to accepted standards of honesty, justice, or morality." Matter of Walton, 251 N.W.2d 762, 763 (N.D.1977). Violation of the Code of Professional Responsibility or the Rules of Professional Conduct is another gauge of the public harm.
False testimony also violates the pledge that Kaiser made in 1969 when he was admitted to the North Dakota Bar:
On my honor, I do solemnly promise: I will maintain the respect due to Courts of Justice and Judicial officers;
* * * * * *
I will employ for the purpose of maintaining the causes confided to me such means only as are consistent with truth and honor, and will never seek to mislead the judge or jury by any artifice or false statement of fact or law;

* * * * * *
(Our emphasis). Kaiser's false statements of fact dishonored his promise to the profession and thereby lowered the public regard for the rule of law.
We understand that Kaiser may have held a false sense of loyalty to his family that conflicted with his sense of professional ethics. But we think that it is also clear that Kaiser's misconduct was motivated, at least in part, by the potential for profit to himself, his family, and his partners. Misplaced loyalties and motivations apart from a lawyer's obligation to the legal system cannot rationalize misconduct or avoid sanctions.
We recognize, too, that Kaiser has demonstrated remorse for his misconduct. Still, the status of the legal profession has suffered grievously from Kaiser's misconduct. His perjuries have been very detrimental to the public interest, and have imposed greatly on judicial resources. See Hunt Trust Estate v. Kiker, 269 N.W.2d 377 (N.D.1978); Serhienko v. Kiker, 392 N.W.2d 808 (N.D.1986); Kaiser v. Kaiser, 474 N.W.2d 63 (N.D.1991); Kiker v. Walters, 482 N.W.2d 626 (N.D.1992); and this extended disciplinary proceeding, as well as additional proceedings still pending in the trial courts after remand of Kiker v. Walters. Kaiser's lies and misplaced loyalties created a tangled web of deception that the judicial system continues to unravel yet.
It is difficult to imagine conduct more "hurtful to the public appraisal of the legal profession" than the deliberate use by "an attorney of false testimony in the judicial process." Dodd v. The Florida Bar, 118 So.2d, at 19. Kaiser's behavior is "antithetical to the oath, the standards, and the ideals of the legal profession." The Florida Bar v. Prior, 330 So.2d 697, 702 (Fla. 1976) (at 703: "[A]n attorney who gives false testimony in a judicial proceeding `deserves the harshest penalty.'") Repeated false testimony deserves a severe sanction.

C. Sanctions

In addressing appropriate sanctions, both Kaiser and Disciplinary Counsel urge us to adopt the sanction recommended by the Mastera public reprimand. Having carefully considered all of the recommendations to this court, we conclude, however, that Kaiser's misconduct requires a more severe sanction.
Each disciplinary action must be "judged on its own merits and facts." Maragos, 285 N.W.2d at 546. Once a disciplinary violation is established, we rely on the published standards of sanctions for guidance, seeking to fairly impose "similar disciplinary measures ... for similar violations under similar circumstances." Id.
Because we have not before had occasion to consider circumstances comparable to Kaiser's, we look to applications of the ABA Standards by other courts. See Matter of Lunn, 118 N.J. 163, 570 A.2d 940 (1990) (Three year suspension for lawyer with prior unblemished record who gave false testimony under oath); see also, Matter of Wood, 247 Kan. 219, 794 P.2d 660 (1990) (One year suspension for lawyer with prior unblemished record who prepared and submitted false affidavits to disciplinary board). These contemporary precedents aid our selection of the sanction here.
We order that Marvin L. Kaiser be suspended from the practice of law for two years commencing June 1, 1992. Kaiser is *110 ordered to pay the costs and expenses of the disciplinary action against him, including reasonable attorney's fees. Before he may practice law again, Kaiser must apply for reinstatement in accordance with NDPRLDD 4.5, including, particularly, certification by the bar examiners of Kaiser's successful completion of the Multistate Professional Responsibility Examination under NDPRLDD 4.5(H).
ERICKSTAD, C.J., MESCHKE, LEVINE and VANDE WALLE, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.
VERNON R. PEDERSON, Surrogate Judge, sitting as a member of the Court to fill the vacancy created by the resignation of Justice H.F. GIERKE III. Justice JOHNSON, not being a member of this Court at the time this case was heard, did not participate in this decision.
NOTES
[1] The American Bar Association issued its Model Code of Professional Responsibility in 1969. The Code is divided into three parts: Canons, Ethical Considerations, and Disciplinary Rules. North Dakota adopted the Code as the rules for ethical and professional conduct of attorneys in 1977.

The Special Master found Kaiser in violation of Canon 1 and of Disciplinary Rule 1-102. Canon 1 says:
A Lawyer Should Assist in Maintaining the Integrity and Competence of the Legal Profession.
Disciplinary Rule 1-102, on Misconduct, says:
(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
North Dakota Court Rules, 1986 Desk Copy, at 585 (footnotes omitted).
The ABA issued revised standards for ethical and professional conduct of attorneys in 1983, called the Model Rules of Professional Conduct. These were modified and adopted in North Dakota in January 1988 to replace the Code of Professional Responsibility.
Although this disciplinary action against Kaiser began after the adoption of the North Dakota Rules of Professional Conduct, his misconduct occurred in 1977 and 1985. Thus, we apply the North Dakota Code of Professional Responsibility.
The North Dakota Rules of Professional Conduct contain a disciplinary standard on misconduct similar to DR 1-102. Rule 8.4, on Misconduct, says:
It is professional misconduct for a lawyer to:
(a) Violate or attempt to violate these Rules, knowingly assist or induce another to do so, or do so through the acts of another;
(b) Knowingly assist a judge or judicial officer in conduct that is a violation of applicable Rules of Judicial Conduct or other law;
(c) State or imply an ability to influence improperly a government agency or official; or
(d) Engage in other conduct that is enumerated in the North Dakota Century Code as a basis for revocation or suspension of a lawyer's certificate of admission.
North Dakota Century Code, Court Rules Annotated, at 905.
[2] Standard 6.0, on Violations of Duties Owed to the Legal System, describes sanctions for this type of misconduct. Rule 6.1, on False Statements, Fraud, and Misrepresentation, says:

Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court: 6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
6.13 Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or in taking remedial action when material information is being withheld, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.
6.14 Admonition is generally appropriate when a lawyer engages in an isolated instance of neglect in determining whether submitted statements or documents are false or in failing to disclose material information upon learning of its falsity, and causes little or no actual or potential injury to a party, or causes little or no adverse or potentially adverse effect on the legal proceeding.
[3] Standard 9.1, on Aggravation and Mitigation, says:

After misconduct has been established, aggravating and mitigating circumstances may be considered in deciding what sanction to impose.
Standard 9.2, on Aggravation, says:
9.21 Definition. Aggravation or aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed.
9.22 Factors Which May Be Considered in Aggravation.
Aggravating factors include:
(a) prior disciplinary offenses;
(b) dishonest or selfish motive;
(c) a pattern of misconduct;
(d) multiple offenses;
(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;
(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;
(g) refusal to acknowledge wrongful nature of conduct;
(h) vulnerability of victim;
(i) substantial experience in the practice of law;
(j) indifference to making restitution.
Standard 9.3, on Mitigation, says:
9.31 Definition. Mitigation or mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed.
9.32 Factors Which May Be Considered in Mitigation.
Mitigating factors include:
(a) absence of a prior disciplinary record;
(b) absence of a dishonest or selfish motive;
(c) personal or emotional problems;
(d) timely good faith effort to make restitution or to rectify consequences of misconduct;
(e) full and free disclosure to disciplinary board or cooperative attitude toward proceedings;
(f) inexperience in the practice of law;
(g) character or reputation;
(h) physical or mental disability or impairment;
(i) delay in disciplinary process which is prejudicial to the respondent;
(j) interim rehabilitation;
(k) imposition of other penal[ ]ties or sanctions;
(l) remorse;
(m) remoteness of prior offenses.
[4] Apparently, Kaiser has not been charged criminally for his misconduct. Nonetheless, false testimony under oath is criminal conduct, as defined in NDCC 12.1-11-01 and 12.1-11-02. NDCC 12.1-11-01(1), on perjury, says:

A person is guilty of perjury, a class C felony, if, in an official proceeding, he makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a false statement previously made, when the statement is material and he does not believe it to be true.
The criminal penalty for a class C felony is given in NDCC 12.1-32-01(4):
Class C felony, for which a maximum penalty of five years' imprisonment, a fine of five thousand dollars, or both, may be imposed.
NDCC 12.1-11-02(1), on false statements, says:
A person is guilty of a class A misdemeanor if, in an official proceeding, he makes a false statement, whether or not material, under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, if he does not believe the statement to be true.
The criminal penalty for a class A misdemeanor is given in NDCC 12.1-32-01(5):
Class A misdemeanor, for which a maximum penalty of one year's imprisonment, a fine of one thousand dollars, or both, may be imposed.