Disciplinary Board v. Lamont, 1997 ND 63, 561 N.W.2d 650|N.D. Supreme Court|
Disciplinary Board v. Lamont, 1997 ND 63, 561 N.W.2d 650
[Go to Documents]
Filed Apr. 4, 1997
IN THE SUPREME COURT
STATE OF NORTH DAKOTA
1997 ND 63
In the Matter of the Application for Disciplinary Action Against Robert J. Lamont, a Member of The Bar of the State of North Dakota
Disciplinary Board of the Supreme Court of the State of North Dakota, Petitioner
v.
Robert J. Lamont, Respondent
Civil Nos. 960258-960261
Application for disciplinary action.
SUSPENSION ORDERED.
Per Curiam.
Paul W. Jacobson (argued), Assistant Disciplinary Counsel, P.O. Box 2297, Bismarck, ND 58502-2297, for petitioner.
James S. Hill (argued) and Daniel S. Kuntz (appearance), of Zuger Kirmis & Smith, P.O. Box 1695, Bismarck, ND 58502-1695, for respondent. Appearance by Robert J. Lamont.
In re Lamont
Civil Nos. 960258-261
Per Curiam.
[¶1] This is a disciplinary action against attorney Robert J. Lamont. We suspend Lamont's license to practice law in this state for 60 days.
[¶2] Lamont is an attorney in private practice in Minot. He also served as general counsel for Trinity Medical Center (Trinity). In 1994, an acquaintance of Lamont's named Gardell Giffey received treatment at Trinity. Two doctors from Medical Arts Clinic, a competing medical facility in Minot, reviewed copies of Giffey's medical records, contacted Giffey, and advised him that he had received inappropriate treatment at Trinity. Giffey, upset that these doctors had reviewed his records and contacted him, consulted Lamont about the possibility of suing the doctors from Medical Arts Clinic. Lamont advised him that, because Lamont represented Trinity, he could not represent Giffey. He referred Giffey to attorney William Zuger, who initiated a lawsuit on Giffey's behalf against the two doctors.
[¶3] During the trial of that action, Trinity's administrator, Terry Hoff, testified Trinity was not paying Giffey's legal expenses and was not financially interested in the outcome of the case. Zuger then approached the bench and advised the court he had an arrangement with Lamont whereby Lamont was paying Giffey's fees and expenses and including those costs in his billings to Trinity.
[¶4] The doctors called Lamont to testify to clarify the financial arrangement. After establishing Lamont was Trinity's general counsel and had referred Giffey to Zuger, the doctors' attorney asked Lamont about the payment of Zuger's fees and expenses:
"Q Has your office entered into an arrangement with Trinity Medical Center regarding Mr. Giffey's attorney fees and expenses in this litigation?
"A No.
"Q Has your office, in any manner, advancing [sic] costs and attorney fees in this litigation for Mr. Giffey?
"A Yes.
"Q And would you tell us the nature of that arrangement?
"A Well, the nature of that arrangement is that Bill Zuger and I discussed the matter after I sent Mr. Giffey to Mr. Zuger. Bill and I discussed the fact that Mr. Giffey was not financially in a position to fund this lawsuit himself, and Bill had discussed with me the fee arrangement that he had with Mr. Giffey being a contingency arrangement, or at least that was what he was proposing to do. Again, because Mr. Giffey didn't have the financial ability. And I told Bill that I would see to it that his fees were paid, and if Mr. Giffey were to recover then I could be repaid.
"Q And so your office then has been paying those attorney fees as they have been coming in?
"A Yes.
"Q And have those amounts been then billed or in any manner recovered from Trinity Medical Center?
"A Every month we sent Trinity bills for our services and the amounts that I have paid Mr. Zuger have been included in those bills.
"Q Okay. So what you're telling me in a roundabout way is that Trinity is paying for Mr. Giffey's fees in this matter?
"A In a roundabout way, yeah.
"Q And has Trinity then therefore paid the bills that you have sent for Mr. Giffey's legal fees.
"A I never sent them any bills for Mr. Giffey's legal fees.
"Q The bills that you have sent Trinity has compensated the plaintiff for fees, has it not?
"A No.
"Q Well, tell me again then what Trinity's arrangement is or how---
"A Trinity doesn't have an arrangement.
"Q You have an arrangement.
"A I have an arrangement.
"Q And then--but you have then passed those bills on to Trinity for payment.
"A I have not sent them any bills that I've received from Mr. Zuger, no.
"Q Any costs?
"A I submit, as I said earlier, I submit a bill once a month to Trinity for the work we do for them.
"Q And what I'm getting at is does your bill for the work that you do that Trinity pays, does that bill include Mr. Zuger's attorney fees? Mr. Giffey's attorney fees?
"A Yes.
"Q Okay. Just so I understand this Bob. The--Trinity is paying the plaintiff's attorney fees in this case.
"A Trinity is reimbursing me for the payments I am making.
"Q And is Trinity's payment--that will continue all the way through this trial? This reimbursement procedure?
"A The arrangement that I have with Mr. Zuger is that I will continue to pay his fees through trial, yes.
"Q Through Trinity?
"A I'm paying the fees. Right.
"Q And passing the bills on to Trinity.
"A I'm not sending them any bill. They are reimbursing me for my expenses as they do for a lot of expenses that I incur.
"Q Who did you talk with at Trinity Medical Center to obtain their approval for that arrangement?
"A I didn't.
"Q What gives you the authority to commit Trinity to reimbursing Mr. Giffey's fees and expenses?
"A I haven't committed Trinity to anything. I made the arrangement with Mr. Zuger personally. If Trinity were to decide to quit paying me legal fees, then I guess they could. They're not committed to Mr. Zuger in any way, shape or form.
"Q Well, has Trinity reimbursed you for Mr. Giffey's fees up to this time?
"A Yes.
"Q And have you passed payment on to Mr. Zuger?
"A I pay Mr. Zuger first."
[Emphasis added].
[¶5] The jury in the Giffey case found in favor of the doctors. After receiving negative publicity from this matter, Trinity terminated its relationship with Lamont. Lamont subsequently repaid Trinity for the fees and expenses billed to it for the Giffey case when it became apparent Trinity's tax exempt status might be jeopardized by its funding of Giffey's lawsuit.
[¶6] The trial judge and the defendant doctors in the Giffey case filed disciplinary complaints against Lamont, calling attention to the unusual nature of the financial arrangements. An investigation revealed correspondence between Zuger and Lamont which conflicts with Lamont's testimony regarding the arrangement for payment of Giffey's fees. On July 18, 1994, Zuger wrote to Lamont:
"This will confirm that, pending outcome of the case, Trinity Medical Center will compensate me at an hourly rate, and reimburse all expenses, to be billed and paid on a monthly basis. . . .
"This will also confirm that in the event that there is a recovery on behalf of Mr. Giffey, that Mr. Giffey will compensate this office on the basis of the enclosed contingency fee agreement. Whatever reimbursement is received from him will be turned directly over to your office, to be paid over to Trinity Medical Center.
* * * * *
"Although Trinity is advancing fees and expenses during the pendency of this matter, it is clearly understood by all parties that Gardell Giffey is the client, and any decisions as to how to proceed will be made solely in his best interests."
Enclosed with the letter was a copy of the contingent fee agreement between Zuger and Giffey, which provided:
"I am aware that Trinity Medical Center has agreed to pay all expenses of this litigation, regardless of outcome, and to compensate Zuger Law Offices on an hourly basis for all work performed, pending final outcome of the matter. In consideration, Trinity Medical Center shall receive any contingency and any recovery of expenses made through verdict or settlement in this case.
"While Trinity Medical Center has agreed to be responsible for expenses of prosecution of this lawsuit, however, it is expressly understood that I am the client and I shall exercise control as provided in this agreement."
On July 20, 1994, Zuger again wrote Lamont, seeking clarification of the agreement:
"This letter is to follow up with one additional question relating to our meeting of July 15, 1994. Our understanding, as I have confirmed by letter, is that Trinity will be responsible for any expenses of litigation, ultimately to be recovered out of any settlement or judgment.
"Does this also apply to any potential costs and disbursements which might be taxed against Gardell? Please clarify this issue."
Lamont responded by letter dated July 26, 1994:
"The two letters you have sent me dated July 18, 1994, and July 20, 1994, regarding the fee arrangement for Gardell Giffey are accurate and your understanding is correct, including the fact that Mr. Giffey's costs would be covered in the event an adverse decision is rendered."
Lamont's letter explained the billing procedure he wanted to employ:
"I would like you to bill me directly and I will incorporate your billing in my monthly billing to Trinity Hospital. I do not want your itemized bills 'floating around' Trinity's accounts payable department. I bill Trinity Hospital at the end of each month and, generally, receive payment between the 15th and the 20th of the following month. Please submit your billing to me prior to the first day of each month."
Finally, Lamont stressed the necessity of protecting Trinity at all costs:
"I, again, would like to emphasize the importance of keeping Trinity's name out of this and if, under pain of death, someone is required to identify Trinity as having involvement in this I would suggest that involvement be as an agent to pay Mr. Giffey's costs, etc., in return for our understanding the neither Trinity or its employees would be defendants in this action."
[¶7] A petition for discipline was served on Lamont on October 26, 1995. After hearing evidence from witnesses and reviewing the documentary evidence, a hearing panel found Lamont had engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation; had failed to maintain respect for the court; and had violated Rule 3.3, N.D.R.P.C., requiring candor toward the tribunal. The panel recommended suspension for a period of up to 60 days. The Disciplinary Board adopted the recommendation of the panel and assessed costs against Lamont. The Board's report has been submitted to this court under Rule 3.1(G), N.D.R.L.D.
[¶8] We review disciplinary proceedings against attorneys de novo on the record under a clear and convincing standard of proof. In re Disciplinary Action Against LaQua, 548 N.W.2d 372, 373 (N.D. 1996); In re Disciplinary Action Against Nassif, 547 N.W.2d 541, 542 (N.D. 1996). Recognizing the hearing panel had the opportunity to directly observe the demeanor of the witnesses, we accord due weight to the findings, conclusions, and recommendations of the hearing panel as adopted by the Board. LaQua, 548 N.W.2d at 373; In re Disciplinary Action Against Garcia, 366 N.W.2d 482, 484 (N.D. 1985).
[¶9] Most of Lamont's arguments to this court have focused on the legal question whether he had actual authority to bind Trinity to a contractual agreement to pay Giffey's fees and expenses. Lamont argues that, when he testified, he was in effect giving his legal opinion that he had no authority to contractually bind Trinity and the agreement to pay fees was therefore between Zuger and himself personally. Thus, he asserts, his testimony regarding the financial arrangement was not deceitful or misleading, but was merely a statement of his opinion based upon agency law.
[¶10] Lamont's argument is not only disingenuous, but it misconstrues the relevant issue presented. This case does not turn upon a resolution of this issue of agency law. It makes no difference whether Lamont had actual authority to bind Trinity, or whether his so-called legal opinion on that issue was right or wrong. Lamont was not called as an expert witness to give his opinion on agency law. He was called as a fact witness to testify to the facts surrounding the financial arrangement for payment of Giffey's legal fees and expenses. In his brief to this court, Lamont correctly characterized the purpose of his testimony:
"Lamont was called as a witness because McGee [the doctors' attorney] hoped to attack Hoff's [Trinity's administrator's] credibility before the jury by attempting to establish or suggest that contrary to his testimony Hoff knew about the arrangement for the payment of Giffey's fees and that Trinity was using Giffey as a pawn in the 'hospital wars.'. . . McGee's goal was to suggest that Hoff and Trinity had knowledge and direct involvement in the arrangement to pay Giffey's fees."
[¶11] Whether Lamont had actual authority to bind Trinity was not particularly relevant to the issue of Hoff's credibility. What was significant to the jury's assessment of Hoff's credibility was Lamont's mischaracterization of the agreement with Zuger. The jury may have found it quite significant to learn Lamont had represented to Zuger and Giffey that Trinity had agreed to pay Giffey's fees and expenses, and that Trinity would be reimbursed if Giffey recovered from the doctors. Lamont repeatedly testified Trinity had no agreement to pay the fees, and Lamont had personally agreed to pay Zuger. The documentary evidence, however, shows Lamont clearly represented to Zuger the agreement was with Trinity, and billing would go through Lamont's office only so Zuger's bills were not "floating around" Trinity's accounting department. Lamont's testimony, even if based upon his own opinion that he had no authority to bind Trinity, was deceptive, misleading, and evasive.
[¶12] Lamont argues his testimony, even if not entirely truthful, did not constitute perjury. The hearing panel did not find Lamont committed perjury. While our perjury and false statement statutes set out the standards which apply generally to all witnesses in judicial proceedings, seeN.D.C.C. §§ 12.1-11-01 and 12.1-11-02, attorneys are officers of the court and must be held to a higher standard. For example, Rule 3.3, N.D.R.P.C., requires an attorney display the utmost candor toward the tribunal; Rule 1.2(A)(3), N.D.R.L.D., authorizes discipline of an attorney who engages in conduct involving dishonesty, fraud, deceit, or misrepresentation; N.D.C.C. § 27-13-01(1) requires attorneys maintain respect for courts of justice and judicial officers; and N.D.C.C. § 27-13-01(6) states an attorney may "never seek to mislead the judge or jury by any artifice or false statement of fact or law." When admitted to the bar in 1976, Lamont took the attorney's pledge, which provided in part:
"On my honor, I do solemnly promise:
* * * * *
"I . . . will never seek to mislead the judge or jury by any artifice or false statement of fact or law . . . ."
We summarized the high duty of candor placed upon attorneys in In re Disciplinary Action Against Kaiser, 484 N.W.2d 102, 108 (N.D. 1992) (citations omitted):
"'Truth and candor are synonymous with justice, and honesty is an implicit characteristic of the legal profession.' ABA, The Judicial Response to Lawyer Misconduct, III.1, III.3 (1984). The primary function of our judicial system is to find the truth to reach a just conclusion. . . . Our courts are almost 'wholly dependent on members of the bar to marshal and present the true facts. . . .' Dodd [v. The Florida Bar, 118 So.2d 17, 19 (Fla. 1960)]."
[¶13] Our review of the record demonstrates ample support for the hearing panel's findings and conclusions that Lamont's testimony was deceptive, intended to mislead, and "misrepresented the actual situation." Lamont's repeated statements that he had agreed to pay the fees personally and that Trinity was not involved in the financial arrangement were, at best, half-truths which were deceptive, misleading to the judge and jury, and misrepresentative of the actual agreement with Zuger.
[¶14] Lamont also falsely testified about the actual payment of Zuger's bills. Lamont testified "[e]very month we sent Trinity bills for our services and the amounts that I have paid Mr. Zuger have been included in those bills." When directly asked if he passed Trinity's reimbursements on to Zuger, Lamont answered, "I pay Mr. Zuger first." Contrary to Lamont's testimony, his office accounting records showed Zuger was always paid after Lamont billed and received payment from Trinity.
[¶15] Lamont asserts he was merely mistaken and was not aware his office staff had withheld payment to Zuger until funds were received from Trinity. That assertion is belied by Lamont's correspondence to Zuger, in which he clearly advised Zuger he needed billings by the first of the month so those amounts could be "incorporated" into Lamont's monthly billings to Trinity. This clearly suggests Lamont was merely acting as a conduit between Zuger and Trinity for payment of the fees, and intended Zuger would be paid after Lamont received the funds from Trinity. The hearing panel specifically found Lamont knowingly lied about the timing of the payments. When the hearing panel heard the witnesses and observed their demeanor, we accord special deference to its findings on matters of conflicting evidence. See Garcia, 366 N.W.2d at 484; In re Disciplinary Action Against Maragos, 285 N.W.2d 541, 546 (N.D. 1979).
[¶16] We concur with the hearing panel that Lamont's conduct violated Rule 3.3, N.D.R.P.C., requiring candor toward the tribunal; Rule 1.2(A)(3), N.D.R.L.D., prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation; and N.D.C.C. § 27-13-01(1), requiring respect for the court. Discipline is therefore warranted under Rule 1.2(A)(1), (3), and (10), N.D.R.L.D.
[¶17] In determining the appropriate sanction, we are guided by the North Dakota Standards for Imposing Lawyer Sanctions. In addition to considering the nature and effect of the lawyer's wrongful conduct, we also consider aggravating and mitigating circumstances. SeeStandard 9.1, N.D.S.I.L.S.; Rule 1.3(c), N.D.R.L.D.; Nassif, 547 N.W.2d at 544.
[¶18] The relevant standards provide:
"6.1 False Statements, Fraud, and Misrepresentation. Absent aggravating or mitigating circumstances, upon application of the factors set out in Standard 3.0, the following sanctions are generally appropriate in cases involving conduct that is prejudicial to the administration of justice or that involves dishonesty, fraud, deceit, or misrepresentation to a court:
"6.11 Disbarment is generally appropriate when a lawyer, with the intent to deceive the court, makes a false statement, submits a false document, or improperly withholds material information, and causes serious or potentially serious injury to a party, or causes a significant or potentially significant adverse effect on the legal proceeding.
"6.12 Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding."
[¶19] In Kaiser, 484 N.W.2d at 109, we noted that false testimony by an attorney is conduct particularly damaging to the profession:
"It is difficult to imagine conduct more 'hurtful to the public appraisal of the legal profession' than the deliberate use by 'an attorney of false testimony in the judicial process.' Dodd v. The Florida Bar, 118 So.2d, at 19. Kaiser's behavior is 'antithetical to the oath, the standards, and the ideals of the legal profession.' The Florida Bar v. Prior, 330 So.2d 697, 702 (Fla. 1976) (at 703: '[A]n attorney who gives false testimony in a judicial proceeding "deserves the harshest penalty."') Repeated false testimony deserves a severe sanction."
[¶20] In this case there are significant mitigating circumstances which make disbarment inappropriate. Lamont's testimony did not result in any benefit to himself personally, or to his client. See Standard 9.32(b), N.D.S.I.L.S. The jury found in favor of the doctors and against Giffey. There was also substantial evidence regarding Lamont's good character and his reputation as an honest and skillful attorney. See Standard 9.32(g), N.D.S.I.L.S. Lamont has an unblemished prior disciplinary record, and he was entirely cooperative in the disciplinary process. See Standard 9.32(a) and (e), N.D.S.I.L.S. On the record before us, we conclude suspension for a period of 60 days is appropriate.
[¶21] We order Robert J. Lamont be suspended from the practice of law for a period of 60 days commencing May 1, 1997. Lamont is further ordered to pay the costs and expenses of the disciplinary proceedings.
[¶22]
William A. Neumann
Mary Muehlen Maring
Ralph J. Erickstad, S.J.
Dale V. Sandstrom, Acting C.J.
Michael O. McGuire, D.J., I concur but would require taking the ethics portion of the bar examination.
[¶23] Michael O. Mcguire, D.J., and Ralph J. Erickstad, S.J., sitting in place of VandeWalle, C.J., and Meschke, J., disqualified.